IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


CHARLES A. NEEDLES                                                                                    PLAINTIFF

           v.                             Civil No. 09-2049

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                                                        DEFENDANT

**MEMORANDUM OPINION**

**I.      Factual and Procedural Background**

Plaintiff, Charles A. Needles, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for supplemental security income benefits ("SSI"), pursuant to § 1602 of Title XVI of the Social Security Act, 42 U.S.C. § 1381a ("the Act").

At the time Plaintiff's SSI application was filed, he was nineteen years of age and had completed the tenth grade. (Tr. 18, 94). He has no past relevant work. (Tr. 18). Plaintiff protectively filed his SSI application on August 21, 2006, alleging a disability onset date of August 1, 2006, due to migraines and a congenital defect in his neck.[1] (Tr. 34-35, 73-76, 92-96, 112, 121).

Plaintiff's SSI application was denied at the initial and reconsideration levels. (Tr. 49-55). At Plaintiff's request, an administrative hearing was held on December 12, 2007. (Tr. 216-51). Plaintiff was present at this hearing and represented by counsel. The Administrative Law Judge (ALJ) rendered an unfavorable decision on September 25, 2008, finding that Plaintiff was not

---

[1] At the hearing, Plaintiff alleged additional impairments, including depression, anxiety, fatigue, dizziness, sleeplessness, memory problems, and weakness in his left arm. (Tr. 15, 21-22, 26-27).

disabled within the meaning of the Act because he was capable of performing one or more occupations existing in significant numbers in the national economy. (Tr. 39-48). Subsequently, the Appeals Council denied Plaintiff's Request for Review on February 19, 2009, thus making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). Plaintiff now seeks judicial review of that decision.

## II.     Medical History

Plaintiff suffers from a congenital defect of the cervical spine. On June 14, 2006, Plaintiff saw Dr. Scott Kuykendall with complaints of neck pain, for which he was taking ibuprofen. (Tr. 170). In addition to cervical muscle spasms, Dr. Kuykendall noted a bony prominence to the left lower cervical spine and upper thoracic spine. (Tr. 170). He assessed Plaintiff with cervical muscle spasms and a congenital bone abnormality, for which he prescribed Soma, Ultram, and Mobic. (Tr. 170). Results of an MRI of Plaintiff's cervical spine, dated June 20, 2006, indicated a Klipple-Feil deformity[2] of the mid-cervical spine with fusion at the C5-6 level and diffuse bulging annuli at the C2-3 and C3-4 levels. (Tr. 174). No disc herniations or signal abnormalities of the spinal cord or canal were noted. (Tr. 174). An MRI of Plaintiff's thoracic spine yielded normal results. (Tr. 175). At a follow-up appointment on June 22, 2006, Dr. Kuykendall noted decreased range of motion in Plaintiff's neck, but no trigger points. (Tr. 169).

On June 16, 2006, Plaintiff presented to Johnson Regional Medical Center with complaints of neck pain. (Tr. 199). Upon examination, Dr. Joseph Kradel noted mild cervical spasms, but otherwise found no muscle, tone, or neurological deficits. (Tr. 199). Dr. Kradel opined that Plaintiff

---

[2] Klippel-Feil syndrome is characterized by fusion of the cervical vertebrae which deforms and limits motion of the neck but usually does not have neurologic consequences. THE MERCK MANUAL 1877 (Mark H. Beers, M.D., et al., eds., 18th ed. 2006).

was "a profoundly strange kid, but that does not mean he does not have some neck pain." (Tr. 199). He gave Plaintiff a prescription for Darvocet and Diazepam before discharging him. (Tr. 199).

Plaintiff saw Dr. Russell Allison on July 14, 2006, with complaints of headaches and neck/shoulder pain that "flares up" three or four days at a time. (Tr. 172). Upon examination, Dr. Russell noted "an obvious abnormality to his neck with a large section of the bone that is grown to the left side. It is very firm and prominent." (Tr. 172). Alignment was otherwise normal, range of motion was fairly good, and there was no atrophy or edema in the upper extremities. (Tr. 172). After reviewing Plaintiff's MRI, Dr. Allison stated:

> I told him I cannot surgically correct his. He is basically trapped with this for life. If he is interested in a neck fusion, I could send him to Tim Burson but I do not think it is in his best interest. Physical therapy would be a good thing for him if he is having pain.

(Tr. 172).

On September 29, 2006, Dr. Suzanne Scott, a DDS consultant, reviewed medical records from Dr. Kuykendall and Dr. Allison and concluded that Plaintiff's impairments were non-severe. (Tr. 176-77). This finding was confirmed by Dr. Sherlyn K. Harris on November 2, 2006. (Tr. 178-79).

On December 8, 2006, at the recommendation of Dr. Allison, Plaintiff began physical therapy. (Tr. 190). Treatment included an ultrasound, electrical stimulation, heat packs, and a TENS unit. (Tr. 190). At his initial session, Plaintiff assessed his pain level at a 7/10. (Tr. 190). However, after only nine treatments, Plaintiff's subjective pain improved from a 7/10 to a 2/10. (Tr. 187). He reported that the TENS unit was "really helping" and that he was "having no pain" with the treatment and TENS unit. (Tr. 186-87). Although Plaintiff discontinued physical therapy without

authorization, his therapist reported that all initial goals had been met. (Tr. 181).

On January 2, 2007, Plaintiff presented to the emergency room at Johnson Regional with complaints of severe left-sided chest pain. (Tr. 183). Results of a chest x-ray were normal, as were Plaintiff's lungs and vital signs. (Tr. 183). Dr. Kradel observed that when Plaintiff was distracted, he sometimes moved without pain. (Tr. 183). Additionally, Dr. Kradel stated:

> There are some underling psychiatric issues with Charles, I am not sure what they are. I am sure he does have some chest wall pain, I think this is exaggerated. Basically he is stating that he has pain so severe that he needs to be in a wheelchair. However, he did not want a shot for pain. He is scared of needles as well. There is just something very strange about the young man. I think a lot of this is psychiatric.

(Tr. 183).

At the request of the Social Security Administration, Dr. Ted Honghiran evaluated Plaintiff on April 11, 2007. Upon examination, Plaintiff had limited range of motion in his cervical spine as well as muscle spasms and pain along the interscapular area of the left shoulder. (Tr. 218). Reflex sensation was intact, but Plaintiff's grip in his left hand was weak when compared with the right side. (Tr. 218). Regarding Plaintiff's condition, Dr. Honghiran stated:

> It is my impression that this gentleman was born with a congenital anomaly of the cervical spine that causes limited range of motion of the cervical spine and causes him to have neck pain and left arm pain. He has weakness in the left hand, but I did not see any evidence of muscle atrophy. Sensation is basically normal.

(Tr. 219). Based on his impressions, Dr. Honghiran opined that "this condition most likely will be a chronic one and I do not think that it will get any better." (Tr. 218).

In an accompanying Medical Source Statement (Physical), Dr. Honghiran found that Plaintiff could lift and/or carry up to 20 pounds frequently and up to 100 pounds occasionally, sit for a total of eight hours in a day, and stand/walk for a total of four hours in a day. (Tr 221-22). With his right

hand, Plaintiff could frequently reach, handle, finger, feel, and push/pull, but could only occasionally reach overhead. (Tr. 223). With his left hand, Plaintiff could occasionally reach (overhead and in all other directions), handle, finger, feel, and push/pull. (Tr. 223). Dr. Honghiran found that Plaintiff could continuously operate foot controls (both feet), frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, and occasionally climb ladders or scaffolds. (Tr. 224). Plaintiff could frequently tolerate humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme heat/cold, and vibrations and could occasionally tolerate unprotected heights, moving mechanical parts, and operating a motor vehicle. (Tr. 225). Dr. Honghiran further stated that Plaintiff could shop, travel alone, walk a block at a reasonable pace, use public transportation, climb a few steps at a reasonable pace with a single handrail, prepare a simple meal, care for his personal hygiene, and sort, handle, and use paper/files. (Tr. 226).

On May 15, 2007, Plaintiff saw Dr. William T. Henry of Radiology Consultants. Dr. Henry performed a CT of Plaintiff's cervical spine without contrast. (Tr. 228-29). He made the following conclusions:

> Minimal curvature is suggested on the AP view. No subluxation of the vertebral bodies is seen on the lateral view. There is a congenital variant at the C5-6 level with an attempt at fusion of the vertebral bodies. Posteriorly, the patient has an enlarged left lateral mass pedicle. There is a mild spina bifida at this level with the left side of the spinous process being very large, extending posteriorly and laterally to the left with the tip actually extending down close to the bottom of T1 vertebral body. This is resulting in some narrowing of the left neural foramina due to the enlargement of the lateral mass and facet area. This is not arthritic in etiology. This is once against just congenital. The facet on the left at the C5-6 level is fused. The posterior elements at C4 also are not completely fused with minimal bifida at this level. No fracture is seen. The C1-2 level is in good alignment and appears normal. Although this study is not adequate for excluding disc extrusions or bulges, no obvious disc extrusion or bulge is seen on soft tissue or disc settings.

(Tr. 228).

On August 15, 2007, Plaintiff saw Dr. Richard McCarthy with complaints of left shoulder/ neck pain and numbness in his left arm. (Tr. 231). Upon examination, Plaintiff had good range of motion throughout his neck, but a painful snapping sensation in his left shoulder due to a left-sided congenital hypertrophied spinous process jutting into the suprascapular area. (Tr. 231). A neurologic exam of Plaintiff's upper extremities was normal except for some weakness in his left intrinsics and triceps. (Tr. 231). X-rays revealed no instabilities and a CT showed some stenosis associated with a Klippel-Feil type congenital deformity. (Tr. 232). In Dr. McCarthy's opinion, the painful shoulder snapping could be easily corrected with removal of a portion of the spinous process; however, he was unsure as to whether Plaintiff would benefit from decompression of some nerve roots. (Tr. 232).

On September 7, 2007, Plaintiff had an EMG performed by Dr. Brent Sprinkle. Results were supportive of C5 radiculopathy. (Tr. 234). Sensation and motor function were intact in both upper extremities, although left extremity testing was limited by pain. (Tr. 236). No lesions, swelling, or edema were found in either upper extremity and there was no evidence of a focal median or ulnar neuropathy of the wrist or elbow. (Tr. 236). Regarding the excising of the prominent area of spinous process, Dr. Sprinkle stated:

> . . . this is quite an unusual congenital anomaly for me to see and it would be quite difficult to predict pain relief outcome of that excision. Certainly it does alter the anatomy and potential overlying muscle irritation may [sic] be some benefit. Of interest is the patient has quite a lot of pain that appears somewhat disproportionate to I [sic] see clinically and just initial nerve conduction testing and shocking of the nerve after testing the median and ulnar nerve he [sic] had so much pain just from this part of the examination that he had lightheadedness and nausea and did actually vomit. In a patient with this seemingly low level of pain tolerance it is increasingly difficult to predict outcomes to interventions. I hope this is helpful to Dr. McCarthy's decision-making.

(Tr. 234).

The ALJ sent Plaintiff for a mental diagnostic evaluation with Dr. Steve Shry on February 1, 2008. Plaintiff reported shoulder pain, anxiety, depression, learning troubles, difficulty sleeping, lack of appetite, memory loss, and increasing difficulty with authority figures. (Tr. 237). He was oriented to time, place and person. (Tr. 239). He denied a history of medication, suicidal ideation, or mental health treatment. (Tr. 237). Dr. Shry noted that Plaintiff was pleasant and cooperative throughout the session, but was vague in his responses, had trouble remembering dates and "was a poor historian." (Tr. 237-39). Additionally, he had poor hygiene and evinced a blunted mood, flat affect, and psychomotor retardation. (Tr. 239). Although Plaintiff reported experiencing anxiety and depression, he was unable to cite the symptoms commonly associated with these disorders. (Tr. 239). When asked about his activities, Plaintiff stated that he could shop independently, drive short distances, sweep, and do dishes, but needed help getting dressed, attending to his personal hygiene, cooking, lifting "outside things," and paying bills. (Tr. 239). In his free time, Plaintiff enjoyed watching television and building computers. (Tr. 239).

Dr. Shry noted that Plaintiff often forgot instructions, had trouble communicating in a socially adequate manner, became easily frustrated, had difficulty with complex tasks but was capable of understanding and carrying out simple instructions within an acceptable time frame, and was impaired in his ability to attend and sustain concentration in completing tasks. (Tr. 239). He estimated Plaintiff's intelligence to be in the borderline to low average range but determined that further evaluation was necessary to rule out cognitive disorder. (Tr. 239). As a result, Dr. Shry deferred making a diagnosis in Axis I, but diagnosed schizoid personality disorder[3] in Axis II. (Tr.

---

[3] Schizoid personality disorder is characterized by a pervasive pattern of detachment from social relationships and a restricted range of expression of emotions in interpersonal settings, beginning by early adulthood and present in a variety of contexts, as indicated by four (or more) of the following: (1) neither desires nor enjoys close relationships, including being part of a family; (2) almost always chooses solitary activities; (3) has little, if

239). He estimated Plaintiff's GAF score to be between 50-61.[4] (Tr. 239). Regarding validity, Dr. Shry opined that Plaintiff's effort and cooperation varied at times and his symptom allegations were somewhat incongruent with his over-presentation. (Tr. 240).

In an accompanying medical source statement, Dr. Shry found that Plaintiff was extremely impaired in his ability to make judgments on complex work-related decisions, moderately impaired in his ability to understand, remember, and carry out complex instructions, and mildly impaired in his ability to make judgments on simple work-related decisions. (Tr. 242). He further found that Plaintiff was moderately to markedly impaired in his ability to interact appropriately with the public (due to "schizoid traits") and moderately impaired in his ability to interact appropriately with supervisors and co-workers and respond appropriately to usual work situations and changes in a routine work setting. (Tr. 243).

## III. Applicable Law

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's

---

any, interest in having sexual experiences with another person; (4) takes pleasure in few, if any, activities; (5) lacks close friends or confidants other than first-degree relatives; (6) appears indifferent to the praise or criticism of others; and (7) shows emotional coldness, detachment, or flattened affectivity. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 697 (4th ed., 2000).

[4] This estimate is of little practical value, as it encompasses mild, moderate, and serious symptoms. *Id.* at 34.

decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

  To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

IV.  **Discussion**

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the application date.  At steps two and three, the ALJ determined that Plaintiff suffers from a severe congenital defect of the back/neck that does not meet or medically equal a listing.  At step four, the ALJ found that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), except that he could only stand and/or walk for four hours.  With the dominant hand/arm, he could occasionally reach overhead but frequently reach in all other directions and frequently handle, finger, feel, and operate hand controls.  With the non-dominant hand/arm, he could occasionally reach, handle, finger, feel, and operate hand controls.  The ALJ further found that Plaintiff could frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, frequently tolerate exposure to humidity, dusts, odors, fumes, gases, temperature extremes, and vibrations, and occasionally tolerate work at unprotected heights and around moving machinery.  (Tr. 39-48).  Because Plaintiff has no past relevant work, the ALJ moved to step five, where he found that considering Plaintiff's age, education, work experience, and RFC, there are jobs[5] existing in significant numbers in the national economy that Plaintiff could perform.  Accordingly, the ALJ determined that Plaintiff was not under a disability as defined by the Act at any time between August 21, 2006, the application date, and the date of the ALJ's opinion.

Plaintiff contends that the ALJ erred by:(1) improperly determining his RFC; (2) dismissing his subjective complaints; and (3) failing to fully and fairly develop the record.  *See* Pl.'s Br. 7-19.

---

[5] The ALJ, relying on a vocational expert's responses to posed interrogatories, determined that Plaintiff could perform the following light occupations with a sit/stand option: machine tender/operator (DOT #605.685-054, 690.685-154, and 663.685-018), of which there are 85,000 jobs nation-wide and 800 locally; sorter/grader (DOT #529.687-186, 529.687-026, and 222.687-014), of which there are 34,000 nation-wide and 710 in Arkansas; and inspector (DOT #559.687-058, 641.687-014, and 521.687-094), of which there are 64,875 nation-wide and 900 in Arkansas.  (Tr. 47).

The remainder of Plaintiff's arguments are either duplicative or without merit and do not warrant further discussion.

### A. RFC

Plaintiff asserts that the ALJ afforded too little weight to Dr. Shry's mental RFC assessment and too much weight to Dr. Honghiran's physical RFC assessment. *See* Pl.'s Br. 14-18. At the fourth step of the evaluation, a disability claimant has the burden of establishing his RFC. *Eichelberger*, 390 F.3d at 591; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). A claimant's RFC is the most he can do despite his limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Masterson*, 363 F.3d at 737. The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be some medical evidence to support the ALJ's determination. *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir 2000).

Plaintiff first argues that the ALJ improperly rejected Dr. Shry's mental evaluation. We disagree. Dr. Shry determined that Plaintiff suffered from schizoid personality disorder, which is characterized by a lack of interest in forming relationships, social isolation, and a cold or indifferent attitude. However, Plaintiff reportedly has a family, helps his stepchildren with homework, enjoys talking to and spending time with others, and plays video games and builds computers in his spare time. (Tr. 23-25, 108-09). Additionally, Dr. Shry stated that Plaintiff often forgot instructions and was impaired in his ability to attend and sustain concentration on basic tasks, yet later determined

Plaintiff had no impairment in understanding, remembering, and carrying out simple instructions in a timely manner. (Tr. 239-42). Most notably, Dr. Shry opined that malingering could not be ruled out due to Plaintiff's inconsistent effort and over-presentation. (Tr. 240). *See Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Inconsistent results and evidence of malingering cast doubt on the validity of Dr. Shry's findings. Furthermore, Plaintiff's lack of mental health treatment and inability to cite the symptoms of depression and anxiety undermine his credibility. *See Kirby v. Astrue*, 500 F.3d 705, 708-09 (8th Cir. 2007) (claimant never sought formal treatment by a psychiatrist, psychologist, or other mental health care professional); *see also Snead v. Barnhart*, 360 F.3d 834, 837 (8th Cir. 2008) (claimant's statements about his mental illness were evasive and self-serving). For these reasons, we find that substantial evidence supports the ALJ's dismissal of Dr. Shry's opinion.

Additionally, Plaintiff contends that the ALJ afforded too much weight to Dr. Honghiran's physical RFC assessment while dismissing the opinions of his treating physicians. In support of this premise, Plaintiff claims that one of his treating physicians restricted him from lifting/carrying over 10 pounds. *See* Pl.'s Br. 15. Curiously, there are no medical records from any physician to corroborate this statement. In fact, several physicians noted that Plaintiff's pain levels were "exaggerated" or "disproportionate" to clinical findings. (Tr. 183, 234). Furthermore, Plaintiff has provided no contrary RFC assessment by another physician, treating or otherwise, that would serve to negate the ALJ's findings. *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (consulting physician's RFC assessment supported the ALJ's RFC finding when none of the claimant's treating physicians opined that she was unable to work). For these reasons, we find that substantial evidence supports the ALJ's RFC determination.

B. <u>Subjective Complaints</u>

Plaintiff contends that the ALJ summarily dismissed his subjective complaints without citing any real inconsistencies. *See* Pl.'s Br. 12. We disagree. When evaluating a claimant's subjective allegations, the ALJ must consider all evidence relating to: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) any precipitating and aggravating factors; (4) the dosage, effectiveness and side effects of medication; and (5) any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is "may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them." *Medhaug v.* Astrue, 578 F.3d 805, 816 (8th Cir. 2009) (quoting Goff *v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). However, subjective complaints may be discounted if there are inconsistencies in the medical evidence as a whole. *Id.*

Contrary to Plaintiff's assertion, the ALJ properly cited the *Polaski* factors and made express findings regarding Plaintiff's daily activities, the duration, frequency and intensity of his pain, and his treatment record. (Tr. 43-46). Plaintiff's activities, including caring for himself, driving, cooking, helping his stepchildren bathe and do homework, performing household chores, and doing light yard work, are inconsistent with his complaints of disabling pain. (Tr. 23-25, 32). *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (claimant's ability to perform housework, take care of her child, cook, and drive was inconsistent with her self-reported limitations). Furthermore, there are several discrepancies between Plaintiff's reported pain level and the objective medical evidence. On January 1, 2007, Plaintiff refused an injection of pain medication despite telling Dr. Kradel that his pain was so severe that he needed a wheelchair. (Tr. 183). At the hearing, Plaintiff testified that physical therapy and medication have been unsuccessful in treating his disabling shoulder/neck pain,

yet he told his physical therapist that the TENS unit was "really helping" and he was "having no pain" with the treatment. (Tr. 186-87). In fact, after only three weeks of physical therapy, Plaintiff had met all initial therapy goals and reported a decrease in his subjective pain from a 7/10 to a 2/10. (Tr. 181-82). Most notably, several physicians opined that Plaintiff's pain appeared to be disproportionate to the objective medical findings. (Tr. 183, 234). A court "will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain." *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (quoting *Goff*, 421 F.3d at 792). Here, the ALJ cited the proper standard, considered the factors in conjunction with Plaintiff's testimony, and then properly discounted Plaintiff's subjective complaints. Accordingly, substantial evidence supports the ALJ's credibility findings.

  C. <u>Development of the Record</u>

In his final argument, Plaintiff contends that the ALJ failed to fully and fairly develop the record concerning his mental and physical limitations. *See* Pl.'s Br. 7-10. The ALJ has a duty to fully and fairly develop the record, even if a claimant is represented by counsel. *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). "It is well-settled that the ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that the record includes evidence addressing the alleged impairments at issue from either a treating or examining physician. *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir.2000). While the Secretary is under no duty to go to inordinate lengths to develop a claimant's case, he must "make an investigation that is not wholly inadequate under the circumstances." *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994) (quoting *Miranda v. Secretary of Health, Educ. & Welfare*, 514 F.2d 996, 998 (1st Cir. 1975)). There is no bright-line test for determining when the Secretary has failed to adequately develop the record; the determination must be made on a case by case basis. *Battles*, 36 F.3d at 45 (quoting *Lashley v. Secretary of Health &*

*Human Serv.,* 708 F.2d 1048, 1052 (6th Cir.1983)).

Plaintiff asserts that the ALJ should have obtained a physical RFC assessment from a treating physician. *See* Pl.'s Br. 7. There is no such requirement under the regulations. The ALJ had sufficient evidence to rely on in making his RFC determination. *See Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005) (rejecting argument that ALJ failed to fully and fairly develop the record where there was no indication that the ALJ was unable to make RFC assessment). Regarding his mental impairments, Plaintiff argues that the ALJ was required to order further consultative examinations to rule out cognitive disorder and borderline intellectual functioning. We have repeatedly stated that an ALJ has no duty "to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996). Furthermore, these alleged impairments were never actually diagnosed, but only alluded to in a mental evaluation fraught with internal inconsistencies. For these reasons, the ALJ had no duty to further investigate Plaintiff's mental impairments. Accordingly, we find that the ALJ satisfied his duty to fully develop the record.

## V.    Conclusion

Having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's determinations at each step of the disability evaluation process, and thus the decision should be affirmed. Accordingly, Plaintiff's complaint should be dismissed with prejudice.

ENTERED this 5th day of May, 2010.

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE